Next up we have Gilmore v. Georgia Department of Corrections. Whenever you're ready, Mr. Chandron. Good morning, Your Honors, and may it please the Court. Ashok Chandron here on behalf of the Plaintiff Appellant, Clarissa Gilmore. When viewed in the light most favorable to Ms. Gilmore, the record here establishes that the defendants conducted a highly invasive strip search, grabbing and physically manipulating her breasts, feeling around between her buttocks, and directing her to spread her vagina for inspection, all with no suspicion that she possessed contraband when she visited her husband at Smith State Prison. The District Court misapprehended several key legal standards in granting defendants qualified immunity for that conduct, and its order should be reversed for any of three independent reasons. First, this Court's decision in Evans clearly established that a strip search of a civilian requires at least reasonable suspicion even when that strip search takes place inside of a detention facility. Nothing about this Court's decision in Powell or the Supreme Court's decision in Florence changed that principle because, by their own terms, those decisions only apply to blanket policies permitting suspicionless strip searches of incarcerated people joining the general population of a jail. Second, irrespective of the level of suspicion needed to initiate a strip search, the District Court erred by failing to separately consider whether the scope of the strip search was abusive and excessive. Especially given that the search took place under threat of arrest and prosecution and involved significant physical intrusions into the most intimate parts of Ms. Gilmour's body. Can I ask you a question about the sort of the inquiry, the clearly established inquiry? In your brief, you rely pretty heavily on out-of-circuit precedent that's effectively on point, I'll acknowledge. To what extent are we permitted to look beyond the territorial boundaries of this Circuit for clearly established law? Well, Your Honor, I think the Supreme Court has made clear in Ashcroft and Wesby and then in the analysis it conducted in the Sheehan case that out-of-circuit precedent is relevant to analyzing whether there's a robust consensus of persuasive authority on a particular topic. So even if, as we would submit that Evans alone is controlling in this case, but even if Evans alone were not enough, Ms. Gilmour was permitted in Ashcroft and Wesby to look to whether there's a robust consensus of persuasive authority. And here it's a rare case where you have so many circuits that have addressed the precise factual scenario we have here of a visitor at a prison and all uniformly come out the same way, which is the same way that Evans came out. What though about the fact, that makes some sense to me, but what about the fact that post-Ashcroft, post-Wesby, we've still got cases saying that we're sort of territory-bound in both sort of what I'll call bucket one clearly established and bucket two clearly established? Well, Your Honor, I think to our knowledge, the only case that has maintained that position following the decisions in Ashcroft and Wesby is the unpublished decision in Sheeha Ethiopian, which we've acknowledged in our papers. And again, I think that's a singular case. It's the only one that cites that language from Thomas that predates Ashcroft and Wesby. To the extent this Court can draw any inferences from that unpublished decision, I think it would be inconsistent with the Sheehan analysis to say that out-of-circuit authority has no role in the clearly established inquiry. Now, there may be room to say that the language in Thomas and in Sheeha Ethiopian means that a plaintiff can't rely solely on out-of-circuit authority to clearly establish the law, but that's not what we have here, right? We have Evans as an in-circuit authority governing squarely the case here. We have a uniformity of out-of-circuit precedent. And I think perhaps most tellingly, we have the defendant's own regulations under Al-Amin and under Hope. Those are relevant to the question of fair notice, which is the touchstone of the qualified immunity. So I think anyway that there may be at least one post-Wesby published decision in which we have said that we're territory-bound in buckets one and two, a case called Bradley v. Benton, which is a – I'll just give you the citation so you can take a look at it. It's 10-F-4-1232. And there the court seems to say with respect to either sort of closely analogous, factually analogous precedent or sort of a general principle clearly established that we have to look at our own precedent only. And if that's true – I mean, I realize that I'm sort of springing this on you, so I'm not asking you to know it. But if that's true, that that's post-Wesby, are we bound by that to our own precedent? Your Honor, I can't speak with specificity to what Bradley said. And I'm happy to make a supplemental notice that the court would like. But, again, I think that a strict reading forbidding any reference to out-of-circuit precedent would be inconsistent with the Sheehan analysis. And, of course, I don't think any of the opinions of this court would be written in a way that would reject an analysis the Supreme Court has expressly adopted. And in Sheehan, for example, the court interpreted the language of Ashcroft and Wesby, and in analyzing whether the law was clearly established in the Ninth Circuit, looked at the approaches of the Fourth Circuit, this circuit, and the Eighth Circuit in assessing whether there was a robust consensus. So I think – and, again, I'm not familiar with the specific language of Bradley, but I don't think a reading that would forbid looking at out-of-circuit precedent is consistent with what the Supreme Court has both directed lower courts to do. And it's self-done in analyzing the clarity of establishments. Counsel, what specific factual issues do you think remain to be litigated that barred summary judgment? Well, Your Honor, I think this is a case where the district court itself acknowledged that almost all of the facts around the basis for the search and the search. Well, I think there are some factual issues. Number one, when you look at the report of the incident, there is absolutely nothing in the report that indicates that they got permission to do the search. That's correct, Your Honor. Okay. So there's an inference that they didn't get permission to do the search. I think that's right. Because you could reason that they would have put it in the report that they filed. So there's a question in my mind whether they were exercising discretionary authority or not. The facts say they were exercising discretionary authority because they got permission to do the search. But assuming they didn't get permission to do the search, then there's no discretionary authority for qualified immunity. Do you agree with that? Yes, Your Honor. In that position, I think the district court, in analyzing the scope of discretionary authority, drew an impermissible inference. And those declarations were filed, what, three years later? That's correct. And so that's an issue. Well, not only that, Rogers or Smith said that she called that he was going to run an investigation. But there's no evidence of any investigation, is there? That's correct, Your Honor. On this record, we don't have any evidence of the investigation. And I think the only notes that Deputy Warden Smith included in his write-up about the call is that he had to look into the search because he couldn't tell her in the moment whether he had approved the search or not. So I think given the facts in the record, as Your Honor noted, the report contains no reference to seeking permission. Ms. Gilmour testified that when she spoke with Deputy Smith, he didn't know that the search had happened. And perhaps most tellingly, that would be bolstered by the fact that Deputy Warden Smith was not on duty that the day the strip search took place. We don't know when he came back on duty. There's nothing in the record. That's correct. And so I think those facts we'd submit would premit— But we don't know where he went. To the extent those facts are in the record, a jury could well credit Ms. Gilmour's testimony that Deputy Warden Smith was not aware of the search before it happened, which would— He may have been out fishing at the gulf or something, but couldn't get a telephone call. That's plenty fair. And, of course, the defendants would be entitled to present an interpretation of those facts that would still have allowed for their version of the events to be true, that somehow they reached Deputy Warden Smith and forgot to make a reference to it in his notes. They're allowed to present that to a jury, but a jury could well believe Ms. Gilmour's testimony and read the record to say that they acted outside of the express requirements of GDC regulations, which, as Your Honor noted, would render them categorically ineligible for qualified immunity. Now, in fairness, you know what the other side's going to say, is that this is an issue that you abandoned. The discretionary authority issue is something that you've abandoned before you came up here. And our case—I'll have to confess, our case in this TR v. Lamar County seems pretty close. On the abandonment issue. Well, I think, Your Honor, we acknowledge that this wasn't raised at the district court below, but under the Department of the District Court, it is well entitled to consider plaintiff issues of law. I think unlike in TR, this is a case where the issues of discretionary authority will come down to the meaning and interpretation of GDC regulations, which are state regulations. So unlike TR, which is a case where the scope of discretionary authority came down to interpreting school board policies, this is a case where, you know, exercising this court's own power to interpret the law, this court need only look at what the GDC regulations mean. And then, if the facts are used by Ms. Gilmore and read in the light most favorable to her, establish that those express state regulations were violated. Can I ask you, and I hate to be so fixated on this question about sort of who it is that can clearly establish the law, but can I ask you another question about this? I mean, if the point of qualified immunity is to give officers fair notice, is it not reasonable for officers to look at the courts whose decisions control their conduct? Right? I mean, like, on the one hand, it does sort of seem to make sense in a case like this, where you've got, you know, eight circuits all going the other way and on-point decisions, and we've just sort of like, we happen never to have addressed this issue. On the one hand, you might think like, you know, sort of any fool would understand that the law is tacking in one direction. How could you not understand that? On the other hand, like, if it were closer, right, five other circuits have addressed it. We haven't yet addressed it, but it's not a layup. You know, it's sort of a thorny question. In those circumstances, would we say that, yeah, even so, the officers are obliged to look across territorial boundaries to figure out what the law requires them to do? You see sort of a line-drawing problem I'm struggling with? I do, Your Honor, and I think that's why the Supreme Court has limited it to a robust consensus of persuasive authority, not simply one or two cases. You know, I don't think this case presents the opportunity for the court to draw that line. You know, there may be a situation where four circuits or five circuits might not be enough, but here where you do have, and just stepping back to the core touchstone of qualified immunity, the first principle is established that it's just about fair notice to the defendants. Here where you have Evans that addresses the single factual context that the defendants have relied on, that this is a strip search inside a detention facility, where you have eight of 11 other circuits that have addressed this exact same scenario and all come out the same way, both all after Bell and both before and after Florence, and where you have the defendants' own regulations. And just to put a finer point on that, you have the defendants' own position to the district court below, all of which uniformly point in the same direction that reasonable suspicion is the minimum. And, you know, I think this is also a case where Evans establishes — Evans makes clear the actual standard may be higher. And so would you say, then, that Evans establishes as a broad principle that at a bottom you'd have to have reasonable suspicion? Yes, Your Honor. I think that's the case. So while it would be — so while it might be sort of confirming and endorsing to look at other circuits' precedent, is it your position, then, that we could travel under Evans alone? I think that's right, Your Honor. I think Evans alone would dictate the results in this case. And it's only buttressed by the other things that we've pointed to, you know. And, again, it would be a question of if there are any distinctions between Evans that could bear on this, which we don't think there are, then the court would need to look to other sources of law. But here I don't think this court does. And I only bring them up to say that all of the authority is pointing in the same direction here. I see my time is up. So unless Your Honors have further questions, I'll save them. Okay. Thank you, counsel. All right. Let's hear from Ms. Cusimano. Good morning, and may it please the Court. My name is Cusimano. I'm one of the four prison officers in this case. I want to start off, unless the Court prefers otherwise, addressing the issue of whether the law was clearly established regarding the level of suspicion that was needed to strip Search and the Skillmore. Can I ask you a threshold question in my mind? So far as I can tell from the briefing, you don't even defend the constitutionality of the search. You're really just writing clearly established, right? That is correct. And the reason we did that is the district court did not reach the issue of number one, what quantum of suspicion is required, and number two, did the officers in this case have that level of suspicion? And so our position is that really the only issue before this court is the clearly established issue. Does the State take a position about whether, as a matter of law, prison officials need reasonable suspicion to strip Search a visitor? I think in our briefs below, we said that we believed that reasonable suspicion was probably the correct standard. And on the merits, you're not changing that position here, right? You're just saying even if that is the standard, we don't think it was clearly established. Do I have your position right? That's exactly right, yes. And so going to that issue, the general Fourth Amendment rules that searches have to be reasonable, which, of course, begs the question of when is a search reasonable? And the answer to that question is going to differ depending on the specific context and the specific facts of a case. But, counsel, given that you agree that reasonable suspicion is the right, I guess, right? And your position and the question is whether that was clearly established in this circuit. What do you say in response to Evans, which says specifically, you know, at a minimum you would need reasonable suspicion, but you might need more? I think Evans is a, there's a very critical distinction in Evans, which is that the strip search in Evans was done for the specific purpose of finding criminal wrongdoing. In other words, it was not for the purpose of finding contraband to make sure that a prison was safe and secure. And this court, in the Evans opinion, made that distinction very clear and said that it was not deciding the issue of the constitutionality of a strip search for the purpose of making a prison secure. So for that reason, I don't think Evans applies in this case. Okay, but let me ask it to you this way. Even if, let's just assume for purposes of this discussion that we agree with you, then even if that's the case, don't we still have a question of fact as to whether the defendants here were searching her for purposes of security of the prison? And she says they couldn't have been because she didn't smell like marijuana, she hadn't used marijuana, didn't have it on her body, never possessed it, blah, blah, blah, et cetera, and she passed through the screening, all the three different ways of screening when she went in. No one said anything. And that, in fact, it seemed more to her like, you know, the two, I guess, Bobo and Milton, Milton had been staring at her and that Milton just wanted to sort of make life difficult for her. So whether or not that's true, we have to assume these facts, right? Correct. So if we assume those facts, then there's no suspicion of contraband. And doesn't this survive summary judgment in that case, in any case? No, because there's no cases from this court, Supreme Court, or the Georgia Supreme Court that have addressed the issue of strip searches in the context of civilians who are inside a prison interacting with inmates at a time when there's an increased risk of contraband being transferred into the prison. So in other words, let me put it a different way. This court has essentially put strip search cases into two different categories. One category says that reasonable suspicion is required, and I'm talking about Evans and schools and border searches. The other category says that no suspicion is required. But in every single one of those cases where it says no suspicion is required, you're talking about inmate searches after they have been outside and they're coming back into the facility. Isn't that right? That is correct. But, Ms. Gilmour, when you look at those two different categories, our case is much more factually analogous to those cases because Ms. Gilmour was inside a prison. She was interacting with inmates. She was in close proximity to inmates. There's not any legal authority whatsoever that says that you can search a person who's not an inmate on no suspicion at all. Is there? No, but there also isn't any case law saying. I understand. The burden is not to show that there isn't any on that, but it is in some way, especially when viewed against the background of Evans and all of the other cases, it is in some way indicative of whether it should have been clear to any competent individual, isn't it? I don't think there is because you have two decisions going different ways, and that puts prison officials who are wanting to search civilians in a difficult position because they have to speculate which category of cases does this case fall into. Because, yes, she is a civilian, but she was also in a prison, and that is the exact type of situation where qualified immunity is meant to protect our officers from that behavior. So are you, sort of to the same question that I was pursuing with your adversary, are you sort of wagering everything on this proposition that clearly established law can come only from the Supreme Court or from us or, in this case, from the Georgia Supreme Court? Yes, that is correct. Because if that's not the rule, you might be in some trouble. I agree with you on that, but I don't think that is the rule. In fact, in March... Let me ask you this. Is there any limit to that sort of proposition that we're sort of territorially bound? Let's assume there are like all of the other 12 circuits have addressed an issue, come down the same way in on-point decisions. It just so happens that we're the last circuit to get to it. The issue is a total layup. It's easy. And yet, would you say in that circumstance that the defendants would be entitled to qualified immunity just by virtue of the serendipity that we happen not to have reached an issue that all 12 circuits agree on? Yes. In this case in March, which was a full court case, this court specifically rejected the idea of using a consensus of authority cases and reiterated that you have to have a case from this court, the Supreme Court... Yeah, I mean, I actually think if my reading of this Bradley v. Benton case is right, I think you might be right about this because I think we've got some post-Wesby cases that do say that. I have to confess, I'm not sure as I'm sitting here that makes any sense at all in the 12-circuit layup case. That just seems very strange to me. It seems like at some point, qualified immunity has kind of jumped the tracks, if that's the rule. And I understand the court's position, but there are cases from 2022, 2020, where this court, again, adheres to the rule of you have to have those three cases. The other thing that I would mention is that the standard for qualified immunity and what constitutes community status law is different from circuit to circuit. And so in Wesby, for example, they were applying the law of the D.C. Circuit. And in the D.C. Circuit, you can look at a consensus of cases. So I think that's another factor for the court to consider. But qualified law is a judgment doctrine that emanates from a ruling of the Supreme Court. So if the Supreme Court says that you can look at a robust consensus of persuasive authority, what right do we have as a circuit to decide you can't? Well, again, I think it was applying the law of the specific D.C. Circuit and not necessarily. But again, the Supreme Court said it, right? So whether it was the D.C. Circuit's construction of what the Supreme Court's original qualified immunity rule was, the Supreme Court obviously adopted that as an appropriate statement of clearly established, right? Yes, yes. And I understand that. I guess really the best thing that I can say is that this court has never actually applied that standard. I know my colleague references the Glass-Cox case, which is where this court did mention the consensus standard. But I would point out that in that case, the court found that the law was clearly established based on two Eleventh Circuit cases. So it never actually went into a determination of what the consensus of cases actually said. So I do understand the court's concern. But again, Marsh specifically rejected consensus of cases. It is a full court opinion, and so it is binding on this circuit. I do want to quickly move on to the other clearly established issue in this case. Can I ask you one more before you move on? Yes. So in your, I guess both in your training materials, right, you say reasonable suspicion. And below, you said, and you've acknowledged today that you think the right standard is reasonable suspicion, whether it was clearly established or not. You say that in the training materials. You said it to the district court. You haven't really disavowed it today, right? So where did you come, how did you come to that conclusion? I'm not asking you to reveal privileged conversations, of course. But how did the State come to the position that reasonable suspicion is the right standard under the Fourth Amendment  And I suspect that the answer may be because there is a robust national consensus that holds that that's the law. Well, Your Honor, I personally actually think that there doesn't need to be any suspicion. But because we put in our briefs below that reasonable suspicion was what was probably required, I think we're kind of stuck with that on a piece of paper. And you train your officers on that, right? That's correct, yes. And so I wasn't trial counsel, so I can't speak to why that decision was made below. But I suspect it probably has something to do with, yes, the fact that Ms. Gilmore is a civilian. And not only that, but if civilians in prisons can be searched for any reason at all, I imagine a lot of people are not going to want to attend visitation, which in turn is going to have a detrimental effect on inmates' well-being. It's not that they can't be searched. I mean, you already searched them. The question is whether they can be strip-searched and have hands put on their bodies for no reason at all. That's the question, right? Right. And not surprisingly, you made the judgment in your training materials and then before the district court that the answer to that question is no. And so my curiosity, and I hope this isn't just an academic curiosity, but my curiosity is you came to that judgment because everybody recognizes that has to be the right rule. And if everybody recognizes that has to be the right rule, doesn't it seem weird that qualified immunity nonetheless protects officers on the ground that they couldn't possibly have recognized that's the right rule? That's just so weird. And, Your Honor, again, I can't speak to why we came to that conclusion below because I was not part of that. But I do think, again, it's important to understand that a reasonable prison official, what they know is that they can conduct strip searches without any suspicion in the prison context. And so while, yes, Ms. Gilmour was a civilian, that is a factual distinction that I don't think prison officials are required to necessarily understand. Suppose, let me give you a supposition. I'll put it that way. Let's suppose that the state is sufficiently concerned about searches violating the Fourth Amendment being unreasonable. These being conducted by correctional officers, let's say. So they have a policy in place in which the higher authority which sets the policy has to know, has to have a request for a search. So the higher authority approves a search. I suggest that qualified immunity is not even in the picture at that point because there's no discretion. The higher authority has told the officer, go ahead and do the search. So you just have, so there's no exercise of discretion. And if there's a violation of the law, it's the higher authority who violated the law. If I understand your question, I think you're obeying to the argument about discretion. The first thing that has to happen to be entitled to qualified immunity is you've got to prove that you were exercising discretion. Correct. All right. The model that I think the state has here is that there isn't any discretion on the part of the correctional officers to conduct a search on their own. Even if they found reasonable suspicion, they can't do that. They have to get permission. And the reason they have to get permission is because the state understands the potential violation of the Constitution if there isn't. So according to your side of the case, they got permission to do exactly what they did, in which event they weren't exercising discretion at all, they were carrying out just an act that was authorized. Well, I do disagree. And I know my time is up, but if I could please. Of course. Please respond. I think when the courts are trying to understand whether somebody acts within their discretionary authority, the first thing they have to do is they have to remove all of the alleged wrongdoing. So they have to remove all of the policy violations, all of the unconstitutional conduct, and assume that the strip search was done correctly with getting consent. They were done in the correct manner. Do you agree that whether there's discretionary authority or they're exercising it is a fact question? Yes, absolutely. It's a fact question. Yes, absolutely. In my view, it's a question that hasn't been – that is open in this case. Well, I think that – The reason I say that is when you look at the report of the incident that was filed the same day, there's not a word about any permission at all. The report – there are three reports. They're all the same. They say – they're all 11 o'clock in the morning, and then they recite that they did the search, and there's not a word in there about permission. And I understand. that since permission is so important to the state that it would have been in the report. That's first. Second, the declaration of Smith is that she called two days later, and he said, I'm going to run an investigation. There's not a shred of evidence, as I can tell, in this record that indicates he did any investigation. One would have expected to find a report of an investigation. So that's why I think there's a factual issue about whether or not they were exercising their discretion or carrying out the edict of Smith. And if not, then they're just correctional officers, and we get to the point – the question about whether correctional officers can conduct a search. Let's assume they have probable cause or reasonable suspicion, and they don't need to report to the higher-up. I understand your point. I do think that Ms. Gilmour has forfeited that issue, and I see that my time is up, so I'm going to hand it back over to my colleague, unless you want me to continue further on that issue. All right. Thank you very much. Thank you. And we'll hear again from Mr. Chandran. Thank you, Your Honor. If I just may respond to a couple points that my colleague made about Evans. First is, you know, my colleague hangs a lot on the fact that this is a strip search that took place inside a prison. Evans is quite clear that that strip search also took place in a jail, so just – What about her – what about her point that it was a search for evidence as opposed to a security search? Does that make a difference? And if it doesn't, why doesn't it? I don't believe it makes a difference, Your Honor, for two reasons. First, this Court and the Supreme Court have regularly recognized that the Fourth Amendment inquiry is an objective one, so an officer's permissible intent won't convert an otherwise unlawful search into a lawful one. And I think, second, Evans itself points to the decision in Bell. The language that my colleague cited about the unique security concerns is meant to, in our read, rather than Bell, which is a Supreme Court-controlling decision from 1979 that did permit jailers to conduct suspicionless strip searches of incarcerated people joining the general population of a jail. But that's different, right? Because in that case, there was a concern of contraband being introduced, right? And she's saying that's exactly the same concern here. That's true, but again, Bell relies both on the danger of contraband and on the fact that incarcerated people, as this Court and the Supreme Court have recognized, have lesser privacy interests. This Court has questioned whether incarcerated people have Fourth Amendment privacy rights at all because of the loss of privacy that's attendant to incarceration. And I think Bell establishes that both of those factors are necessary, applying the test that the Supreme Court set forth in Skid Row, that suspicionless strip searches, or suspicionless searches at all, are only permissible where the intrusion into privacy is minimal and there's a significant government interest that could be served by a blanket policy rather than discretionary acts. So I think this case, and Evans recognizes that this case, is far afield from that. The second thing that my colleague mentioned that I'd like to respond to is the idea that civilians present increased risk of contraband by virtue of being inside a prison. I think that ignores the plain limitations contained in Florence. Florence is a decision from the Supreme Court that emphasized its own narrowness and is very clear, both in the writings of the majority from Justice Kennedy as well as the concurrences from Justice Alito and Justice Roberts, to make clear that that decision only applies to incarcerated people bound for the general population of a jail. And there's no question here that Ms. Gilmer was not bound for the general population of a jail. She wasn't an incarcerated person, she wasn't entering general population, and the strip search wasn't pursuant to a blanket policy. And then finally, on the question of how to think about other circuits, to go to your point, Judge Newsom, again, without having read some of the later decisions that I don't think are cited in the papers, I think that given what the Supreme Court did in the Sheehan case, the Supreme Court wouldn't be in a position to say that there's no role for out-of-circuit precedent. Again, I think the best read of that language, at least from the Sheeha Ethiopian case and the continuing language of Thomas, is that a plaintiff can't rely on out-of-circuit authority alone, which is what the plaintiffs in those cases attempted to do. But here, where you have Evans, where you have the regulations, and where you have the robust consensus of eight of 12 other circuits all pointing in the same direction, I think that this Court couldn't ignore under Sheehan where those other circuits have also come out. Thank you, counsel.